UNITED STATES of America, Plaintiff,

v.

Louis RUGGIERO, Jr., a/k/a "Jerry," a/k/a "Lieutenant," David Cleary, a/k/a "Heavy D," a/k/a "Anthony Monti, Michael Palazzolo, Anthony Castelli, Richard Olivieri, Robert Aulicino, Jr., Derrick Augustine, a/k/a "D," James Brown, a/k/a "Justice," Robert Cherry, a/k/a "Sherry," and Keith Green, Defendants.

No. S 92 CR. 811 (KC).

United States District Court, S.D. New York.

June 8, 1993.

**382**

Elizabeth Glazer, Paul Gardephe, Asst. U.S. Attys., New York City, for U.S.

Robert J. Krakow, New York City, for Robert Aulicino.

Jeffrey A. Bronster, Decotiis Phillips & Lundster, Roseland, NJ, for Louis Ruggiero.

Joseph R. Benfante, New York City, for David Cleary.

## ORDER

CONBOY, District Judge:

The defendants have been indicted for multiple counts of racketeering, kidnapping, extortion, murder, possession of weapons and other crimes. The Court has before it a number of motions made by the parties.

The Government has moved for the empaneling of an anonymous jury, and an order in limine precluding defendant Aulicino's counsel from cross-examining a Government informant, Augustine, about an alleged post indictment obstruction of justice purportedly participated in by defendants Ruggiero and Cleary.

Defendant Ruggiero has moved to suppress the fruits of electronic surveillance conducted pursuant to orders of the Superior Court of New Jersey. He also has made certain oral motions and joins in the motions of his co-defendants.

Defendant Cleary has moved for disclosure under the Jencks Act; disclosures under *Giglio;* disclosures under *Roviario;* access to confidential informants under *Saa;* suppression of identification evidence under *Simmons* and *Wade;* disclosure of *Brady* material; inspection of certain Government reports and documentation; direction to Government agents who have worked on this case to retain their rough notes; a hearing to determine the audibility of tapes and accuracy of transcripts; disclosure of the Government's trial exhibits in advance of trial; an order requiring the Government to give Rule 404(b) notice; preclusion of any evidence relating to any extraneous crime or misconduct of a defendant or defense witness; suppression of physical evidence seized from defendants; the striking from the caption of the indictment aliases attributed to the defendant Cleary; a bill of particulars and permission to adopt motions of co-defendants.

Defendant Cleary has also moved to suppress the fruits of the New Jersey electronic surveillance on the grounds of lack of proper authorization, failure to timely seal the recordings, and failure to properly amend.

Defendant Aulicino has moved for a severance; disclosure of discovery; a bill of particulars, *Brady* material; suppression of identification testimony; disclosure of identity of government informants; suppression of oral statements made by defendant Aulicino; and permission to adopt the motions of co-defendants.

Defendant Palazzolo has moved for suppression of identification testimony; a severance; suppression of co-defendant statements under *Bruton;* disclosure of the

names and addresses of Government informants who will be witnesses at the trial; and permission to join all motions made by co-defendants.

Defendant Olivieri has moved for a bill of particulars, further discovery; preclusion of evidence under Rules 403 and 404; *Brady* material; a severance; suppression of identification evidence under *Simmons* and *Wade;* suppression under *Franks* of evidence seized under a search warrant and other evidence seized without a warrant; dismissal of the indictment on grounds of lack of specificity (subsequently withdrawn); and permission to join in the motions of co-defendants.

The defendants Ruggiero, Cleary and Aulicino have also moved orally for a postponement of the trial until after the sentencing of defendants Palazzolo and Olivieri, who entered pleas of guilty to certain of the charged offenses herein on June 1, 1993. The motions assert that defendants Ruggiero, Cleary and Aulicino intend to call defendants Palazzolo and Olivieri as witnesses, and require the adjournment to obviate Fifth Amendment impediments to access to the testimony sought.

As a result of the aforesaid pleas of guilty, all remaining parties agree that the motions raising *Bruton* issues are moot, and deemed withdrawn.

We address first the Government's motions.

## I. *Empanelment of an Anonymous Jury*

We grant the Government's motion for the empaneling of an anonymous jury in this case. By letter of May 6, 1993 the Government provided the defendants with details of a scheme to bribe or, failing that, to murder one Roberto Mercedes, a kidnap victim of the defendants according to indictment, who the defendants expect to testify against them at trial. The affirmation of Assistant United States Attorney Elizabeth Glazer ("AUSA Glazer" and "Glazer Aff.") dated May 11, 1993 sets forth the extraordinarily violent nature of the alleged conduct charged to the defendants, notes that three of the defendants, as fugitives, remain at large, and recites the extremely heavy penalties, including life imprisonment and mandatory twenty-five year sentences that would follow a jury verdict of conviction.

According to the Government, on December 9, 1992, Derrick Augustine and his lawyer, Wesley Serra, met with the prosecutors in this case to discuss the possibility of cooperating with the Government. Augustine told the Government that his co-defendants, who were incarcerated with him at FCI Otisville (only Aulicino was admitted to bail), had solicited his help in locating Roberto Mercedes, one of the alleged enterprise's kidnapping victims. The defendants told Augustine that they wanted to bribe Mercedes so that he would not testify at trial. The plan was to pay Mercedes $50,000 if he signed an affidavit exonerating the defendants. Although David Cleary had the most contact with Augustine because of the proximity of their cells, defendants Ruggiero, Olivieri, Palazzolo and Castelli fully supported this effort. In the event that Mercedes refused to accept the bribe, Cleary, Ruggiero and Palazzolo told Augustine that they would have Mercedes killed. Cleary also told Augustine that the defendants had bribed other individuals whom they believed the Government would call as witnesses at trial.

Cleary asked Augustine to contact an acquaintance of his named "Nancy" whom the defendants knew could find Mercedes. Nancy was to arrange a meeting between Mercedes and the defendants' outside contact. Augustine provided Cleary and Olivieri with "Nancy's" beeper number. The beeper number, in fact, belonged to an undercover police officer.

The defendants became suspicious that Augustine was cooperating after he had remained at the MCC for several days, while they had been returned to Otisville. They suggested that Augustine's cousin "Raymond" could be the go-between, and asked to meet "Raymond" in person. At about this time, Cleary told Augustine that once they took care of Mercedes the case against them would be finished. Cleary said that they should kill Mercedes as a "last resort." On another occasion, Cleary had told Augustine that he was reluctant to kill Mercedes because there were already "too many bodies in

the case." Cleary told Augustine that Olivieri, Palazzolo, Ruggiero and Castelli had each agreed to contribute $5,000 to bribe Mercedes; Cleary said that Mercedes would get another $25,000 when the case was over.

On March 12, 1993, after several delays because of bad weather, an undercover officer, posing as "Raymond", met with Cleary and Castelli at FCI Otisville. Also present were Tim Nicoletti and Ida Ruggiero. Ms. Ruggiero is the sister of defendant Louis Ruggiero, Jr. Cleary had described Nicoletti as a childhood friend whom he could trust completely and who understood that the purpose of the meeting was to arrange to pay off a witness. Nicoletti, according to Cleary, had recently become a private investigator. A few days before the meeting, Olivieri put in a special request to have Nicoletti visit Olivieri on March 12, 1993.

During the March 12, 1993 meeting at Otisville, one of the defendants noticed that the undercover officer was wearing jewelry with initials that did not match his purported name. "Raymond" explained that he had stolen the jewelry. Cleary then took Augustine aside and asked if they could trust "Raymond" not to steal their money. Lacking confidence in "Raymond," the defendants did not make reference to killing or bribing Mercedes during the meeting. After the meeting, the defendants told Augustine that they did not trust his "cousin." The defendants were particularly wary since they had already given money to another individual to find Mercedes; that person had taken the money but had not produced Mercedes.

Shortly thereafter, the undercover officer left a message and then spoke to Nicoletti on the telephone. The conversation was general and ambiguous. Nicoletti said he had to talk to Cleary. At about this time Castelli told Augustine to tell "Raymond" not to leave messages on Nicoletti's machine in which he spoke too openly.

On or about April 7, 1993, Cleary asked Augustine why Augustine was on the list to go to the MCC. Cleary made Augustine swear that "Raymond" was not a cop.

On April 8, 1993 Augustine was moved to the MCC and signed a cooperation agreement with the Government.

On April 29, 1993, Olivieri met Augustine at the MCC near the bullpen. Olivieri told Augustine that if he testified against his co-defendants he would have "a problem;" but if Augustine did not testify he would receive money.

The affirmation of Elizabeth Glazer, dated June 3, 1993 ("Second Glazer Aff.") amplifies the Government's factual submission. After the March 12, 1993 meeting, Augustine saw Ruggiero and Palazzolo in the courtyard of FCI Otisville. When they asked how the meeting went, Augustine reported that it did not go well because Cleary did not trust his "cousin." Ruggiero then complained that had Cleary listened to Ruggiero when Ruggiero was in Riker's Island they would not have these problems. For approximately a year before his September 1992 arrest in this case, Ruggiero had been incarcerated at Riker's on charges that he had attempted to murder Roberto Mercedes. Second Glazer Aff. at ¶ 3. Ruggiero explained that while he was at Riker's he told Cleary that the had a contact who could find Mercedes. However, at that time Cleary told Ruggiero to wait, because, as Ruggiero explained it, since Cleary was not in prison he thought he had nothing to worry about. However, by the time Cleary was arrested, according to Ruggiero, it was too late, because by then, Ruggiero had lost touch with his contact to Mercedes. Second Glazer Aff. at ¶ 4.

Augustine's account of his conversation with Ruggiero is corroborated by another cooperating witness, Barry Shawn. Shawn was a member of the enterprise charged in the indictment and has pled guilty to an information that mirrors Count One of the indictment. Until approximately August 1992, Shawn was incarcerated with Ruggiero at Riker's Island. Shawn told the Government in May of 1992 that Ruggiero had offered him money if he would exonerate Ruggiero at his trial on the attempted murder of Mercedes. Ruggiero accurately reported that by the time of Cleary's September 1992 arrest on the charges in this case, Ruggiero had lost contact with Shawn; by

that time Shawn had been moved into federal custody. Second Glazer Aff. at ¶ 5.

Ruggiero and Cleary also attempted to influence a witness after their February 1991 arrest in Queens on a gun possession charge. The events surrounding that arrest form the basis for the Racketeering Act Ten of Count which charges Ruggiero and Cleary with conspiring to kidnap Jorge Davila, a/k/a "Tony." Ruggiero and Cleary were arrested with another individual, Albert Van Dyke, who is also cooperating with the Government. Van Dyke told the Government that his bail in that case had been put up by his co-defendants. Van Dyke also said that Ruggiero and Cleary had tried to persuade him to take the "weight" on the Queens charge. Second Glazer Aff. ¶ 6.

Van Dyke's account is further corroborated by a telephone conversation recorded on David Cleary's telephone pursuant to a wiretap authorized by the New Jersey Superior Court. On May 13, 1991, at 4:28 p.m., Cleary and Ruggiero discuss their case and whether they will get a plea:

Ruggiero: ... Well, I think, that guy opened his mouth.

Cleary: Van Dyke?

Ruggiero: Yeah.

Cleary: No shit. Of course he did, I told you that.

Ruggiero: No, I mean now like officially he doesn't give a shit anymore. And like you know he's doin' what, he's fully cooperating now, I think.

Cleary: Yeah. Bu, bu so what?

Ruggiero: 'Cause we know, we never sent no money, never do nothin'.

Cleary: He would've done it anyway.

Ruggiero: It probably would've been a waste of money, anyway.

Cleary: Yeah.

Ruggiero: So.

Cleary: But, but what do you mean, like what can he do?

Ruggiero: I don't know, you know, it's just ... You know maybe he'll just like use

him fully as a witness to put everybody together. You know?

Second Glazer Aff. at ¶ 7.

Ruggiero and Cleary plainly have the ability and the inclination to tamper with a jury. On the wiretap, Ruggiero's sister refers on several occasions to her uncle in the Bronx, Angelo Prisco. Numerous reliable confidential informants for the Federal Bureau of Investigation have stated that Prisco is a powerful capo in the Genovese La Cosa Nostra Crime Family. The Government argues that in light of the life without parole sentence that the defendants face, they have every reason to reach out to their relatives and associates who possess the wherewithal and experience to tamper with jurors. Second Glazer Aff. at ¶ 8.

Ruggiero has in the past relied upon his father, Prisco's brother-in-law, to assist him. For example, in a June 3, 1991 call recorded between Ruggiero and an unknown male, pursuant to a court-authorized wiretap, Ruggiero discusses his Queens case. Ruggiero tells his friend that he is facing a gun charge, "but my father said he can get me out of it, so I ain't worried." Similarly, in the conversation referred to above, Ruggiero tells Cleary, in reference to the Queens case: "My father's gonna take care of it." Second Glazer Aff. at ¶ 8.

Ruggiero's father's willingness to improperly interfere is further borne out by evidence of his involvement in his son's recent attempt to bribe a guard at FCI Otisville. The Warden of FCI Otisville told the Government that Ruggiero tried to bribe a guard to smuggle in a pair of tennis shoes. Ruggiero gave the guard his father's number and told the guard that if he complied with Ruggiero's request, Ruggiero's father would take care of him. Second Glazer Aff. at ¶ 9.

Defendant Aulicino advances principally two arguments in opposition to the Government's motion for an anonymous jury. First, he erroneously asserts that anonymous jury motions have been granted in only four fact patterns which are not present in this case. Aulicino Memorandum of Law ("Aulicino Mem.") at 4. Second, Aulicino again erroneously contends that in a similar case, *United States v. Coonan*, 664 F.Supp. 861 (S.D.N.Y.

1987), Judge Knapp denied the very relief the Government requests here.

As an initial matter, the cases in which the courts have granted an anonymous jury motion are not confined to the fact patterns that Aulicino presents. Rather, the courts have inquired whether "there is a strong reason to believe the jury needs protection ... [and] there are reasonable precautions [that can be taken] to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991). That inquiry requires a flexible examination of all the circumstances of the case and the history of the defendants. For example, in *Paccione*, the racketeering indictment which related to the carting industry, was based entirely on mail fraud predicates and contained no allegations of violence or of organized crime connections by the defendants. Rather, the Government's motion and the court's decision was based on 1) the long prison sentences the defendants faced (two of the defendants were subsequently sentenced to twelve years' imprisonment and one defendant was sentenced to a year in jail, *Paccione*, 949 F.2d at 1191); 2) the murder of a co-defendant in circumstances that suggested a connection to the case and some of the defendants; 3) the association of two defendants with organized crime; 4) an anonymous and threatening telephone call to a Government witness; 5) and the extensive media coverage the case had received. *Paccione*, 949 F.2d at 1192–93.

▮ In this case, the facts are even more compelling than in *Paccione:* if convicted, Cleary and Ruggiero face a mandatory life sentence without parole, and Aulicino faces a mandatory twenty-five year sentence on the gun counts alone, *see Deal v. United States*, —— U.S. ——, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993), that must run consecutively to any sentence he receives on the racketeering counts; the indictment contains numerous allegations of violent and retributive behavior;[1] three witnesses have described attempts by the defendants to influence their testimony variously in this case and in a gun possession case in Queens, and their accounts have been corroborated by one another and by tape-recorded evidence; Ruggiero's uncle, Angelo Prisco, is according to the Government, a Genovese crime family functionary who has the kind of associations that would facilitate jury tampering; and taped conversations show that Ruggiero's father has promised on previous occasions to help Ruggiero fix a case.

Aulicino relies on *Coonan* for his untenable position that the Court must find that the defendants have tampered with jurors or a prosecutor and not just witnesses before granting an anonymous jury motion. Aulicino Mem. at 5. The defendants in this case have never before been judged by a jury. Their inclination to interfere with the jury's deliberations may be inferred from their past efforts to improperly affect the outcome of other charges against them.

Indeed the very case that Aulicino relies upon most heavily to oppose the Government's anonymous jury motion is one in which the Court granted the very relief the Government seeks here: the Court precluded "questioning jurors as to their exact addresses or places of employment ... [and] direct[ed] that the jurors shall be kept in the custody of the United States Marshal upon their arrival at the courthouse until after the close of court each day, and that the Marshal shall make all appropriate arrangements for transportation of jurors from the courthouse at the end of each day."[2] *Coonan*, 664 F.Supp. at 863.

1. Exposure to this evidence is likely to cause even the most stalwart jurors to fear for their personal safety, unless their identities are kept confidential in some fashion. As the Second Circuit asked in *United States v. Barnes*, 604 F.2d 121, 140–41 (2d Cir.1979), "[i]f a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be as free and impartial as the Constitution requires?"

2. Although the Court kept the first names and addresses confidential, during jury selection, the Court did permit the jurors last names to be known. In this case, the Government has requested that the last names also be kept confidential.

The Government additionally notes the likelihood of substantial media coverage of the trial in light of extensive pretrial reporting on the case, and the possibility of press inquiries of individual jurors, should their names and addresses become public, with the consequent risks to defendants' rights.

Based upon this record, we find that there is a substantial reason to believe (1) that an effort might be made to intimidate or influence jurors at trial; and (2) that jurors could reasonably fear retaliation if they rendered guilty verdicts. As the Second Circuit held in *United States v. Barnes*, 604 F.2d 121 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), it is not necessary to "wait until fears ... become realities" to take steps to prevent such attempts at improper influence or intimidation. A jury selected anonymously and managed in such a way to ensure that its members cannot be contacted directly or indirectly is the only way to "protect the integrity of criminal trials against this kind of disruption, whether it emanate[s] from defendants' enemies, from their friends, or from neither." *United States v. Borelli*, 336 F.2d 376, 392 (2d Cir. 1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965).

The Second Circuit has repeatedly upheld the use of anonymous juries where there is a strong reason to believe that the jury needs protection, and reasonable precaution is taken to minimize any adverse effect on the jurors opinion of the defendants. *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir.1991); *United States v. Vario*, 943 F.2d 236, 239 (2d Cir.1991); *United States v. Tutino*, 883 F.2d 1125, 1132 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990); *United States v. Persico*, 832 F.2d 705, 717 (2d Cir.1987), *cert. denied*, 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988); *United States v. Ferguson*, 758 F.2d 843, 854 (2d Cir.), *cert. denied*, 474 U.S. 841, 106 S.Ct. 124, 125, 88 L.Ed.2d 102 (1985); *United States v. Thomas*, 757 F.2d 1359, 1364–65 (2d Cir.1985); *United States v. Barnes*, 604 F.2d 121, 133–43 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Rosado*, 82 Cr. 463 (E.D.N.Y.1983), *aff'd*, 728 F.2d 89, 94–95 (2d Cir.1984); *See also United States v. Gibbons*, 602 F.2d 1044, 1050–52 (2d Cir.1979); *United States v. Borelli*, 336 F.2d 376, 392 (2d Cir.1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). "In recent years many trials involving multiple defendants indicted on racketeering and narcotics charges have been tried to anonymous juries." *Hayden v. United States*, 814 F.2d 888, 892 (2d Cir. 1987).

In *United States v. Barnes*, the Second Circuit upheld the empanelment of an anonymous jury and noted that "in a case that generated as much pretrial publicity as [*Barnes*] and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would not become realities." 604 F.2d at 141.

Similarly, in *United States v. Thomas*, a RICO and narcotics case, the Second Circuit upheld the trial judge's decision to take precautionary measures and to empanel an anonymous jury. In discussing *Barnes*, the Second Circuit noted that "an anonymous jury" was "a necessary precaution [in that case] to save the jurors from a fear of retaliation that could affect their deliberations." 757 F.2d at 1364 (citing *Barnes*, 604 F.2d at 104–41). In upholding the use of an anonymous jury, the Court found that "the protection of jurors is vital to the functioning of the criminal justice system":

> As a practical matter, we cannot expect jurors to "take their chances" on what might happen to them as a result of a guilty verdict. Obviously, explicit threats to jurors or their families or even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict. Justice requires that when a serious threat to juror safety reasonably is found to exist, precautionary measures must be taken.

757 F.2d at 1364.

Relying on the well-settled law in this circuit, many judges in this District have granted anonymous jury motions similar to this one. In *United States v. Guy Fisher, et al.*, 83 Cr. 150, *aff'd sub nom. United States v. Thomas*, 757 F.2d 1359, 1364–65 (2d Cir. 1985), a RICO and narcotics case, Judge

387

Pollack ordered the empanelment of an anonymous jury on the basis of the serious offenses with which the defendants were charged, as well as the pretrial publicity that the case had attracted. Similarly, in *United States v. Mutulu Shakur, et al.,* SS 82 Cr. 312 (the "Brinks case"), *aff'd sub nom. United States v. Ferguson, supra,* 758 F.2d at 854, Judge Duffy granted the Government's motion because of the pretrial publicity generated by the case and because of the allegations of dangerous and unscrupulous conduct. The courts have granted requests for anonymous juries where there has been evidence that a witness had been threatened and that a co-defendant has been murdered in circumstances strongly suggesting a connection to the defendants, *United States v. Paccione,* 949 F.2d at 1192–93, or where defendants have been charged with grand jury tampering and the trial is expected to attract publicity. *United States v. Vario,* 943 F.2d 236, 240 (2d Cir.1991).

Where jury anonymity is warranted, the Court has found that the defendants' rights are protected by the court's conduct of "a *voir dire* designed to uncover bias as to issues in the case and as to the defendant himself." *United States v. Vario,* 943 F.2d at 242 (*quoting United States v. Barnes,* 604 F.2d at 140).[3] Furthermore, the Second Circuit has concluded that the danger that the anonymous procedure would "cast unfair aspersions" on the defendants, *United States v. Persico,* 621 F.Supp. 842, 879 (S.D.N.Y.1985), is substantially minimized where the court gives the jury a plausible reason for not disclosing their identity or taking other security measures. *See United States v. Paccione,* 949 F.2d at 1193 (explained as protection against pressures from the media); *United States v. Thomas,* 757 F.2d at 1364–65 and n. 1 (same).

The Government has proffered evidence here demonstrating that the defendants have orchestrated a concerted effort to bribe individuals they believe will be Government witnesses. In one case, they have repeatedly stated their willingness to kill a particular witness, if necessary. Glazer Aff. at ¶ 4. Defendant Olivieri allegedly threatened a witness. Glazer Aff. at ¶ 12. The facts asserted are more than sufficient to justify an anonymous jury; "a trial within a trial to determine whether the alleged wrongdoing ... occurred [is] not required." *United States v. Thomas,* 757 F.2d at 1365. In a case such as this, where the defendants face life imprisonment and have already demonstrated their willingness to improperly influence or injure witnesses, there is a compelling need for an anonymous jury.

■ Accordingly, in order to ensure that the jury will be free from any improper influence, intimidation or fear during the trial, *voir dire* examination of the prospective jurors shall be limited so that no venireman's name, address, or place of employment is disclosed; during trial, the jurors shall be kept together during recesses and taken to lunch as a group each day by the United States Marshal's Service; and at the end of each trial day the jurors shall be transported together by the United States Marshal's Service from the Courthouse to an undisclosed central location, from which they can leave for their respective communities.

## II. Limitation of Inquiry Regarding the Obstruction Matter

In its letter of May 6, 1993 to the Court and Counsel, the Government stated that because of Sixth Amendment concerns it would not offer evidence on its case in chief of the aforementioned post-indictment obstruction revealed by Augustine, and asked the Court to preclude defense counsel from

---

3. The Court will conduct a similarly "searching" *voir dire* in this case. Once the panel arrives for service, the Court will inquire into the jurors' field of employment, family history, marital status, family members' occupations, education, knowledge of the alleged participants in these crimes or attorneys in the case, and attitudes toward the Government, surveillance, and other issues relevant to the trial. This *voir dire* will provide both sides with "an arsenal of informa-

tion" based upon which peremptory challenges can be exercised in an informed manner. *United States v. Barnes, supra,* 604 F.2d at 142. Judge Leval also conducted a similar and extensive *voir dire* in connection with jury selection in *United States v. Badalamenti, aff'd sub nom United States v. Casamento,* 887 F.2d 1141 (2d Cir.1989) ("the Pizza Connection" case) and in *United States v. Tutino,* 883 F.2d 1125, 1132 (2d Cir. 1989), a four defendant narcotics case.

alluding to it in their opening statements to the jury. The Government also argued that the defense counsel should be required, before the closure of the direct examination of Augustine, to indicate whether they intended to question Augustine about the obstruction matter on cross-examination. If the indication was affirmative, the Government stated that it intended to seek a recess to allow the trial prosecutors, presently insulated from and uninformed about the details of Augustine's knowledge of evidence on the obstruction matter, to debrief Augustine in order to include his account of the matter on his direct examination.

At a hearing on June 1, 1993 counsel for the defendants Ruggiero and Cleary stated, not surprisingly, that they did not intend to raise the obstruction matter, and that they would object and demand a severance if Aulicino, who all parties agree was not involved in the alleged obstruction, raised the matter in either his opening statement or his cross-examination of Augustine. Aulicino's counsel stated that he fully intends to do so, on the theory that Aulicino's non-participation in the obstruction scheme is probative of his lack of participation in the conspiracy and joint crimes charged in the indictment.

By letter dated June 2, 1993 the Government moves for an order, *in limine*, precluding Aulicino's cross-examination of Augustine on the obstruction matter on the ground that since the planned bribery or murder related to Roberto Mercedes, the victim of a kidnapping for which Aulicino is not charged, Aulicino had no motive to interfere with Mercedes' testimony. Accordingly, the Government argues, since Aulicino did not participate in a plan to tamper with evidence that is irrelevant to this case, the line of questioning proposed by his counsel cannot shed light on his state of mind regarding the charges that have been filed against him.

Defendant Aulicino argues that the Government's motion should be denied because a) he has a constitutional due process right to "present a defense"; b) he has a constitutional Sixth Amendment right to confront his accusers; c) the rules of evidence must in some cases be suspended to support such superceding rights; and d) he is entitled to wide latitude on cross-examination. Defendant Robert Aulicino's Memorandum of Law in Opposition to the Government's Motion In Limine, dated June 7, 1993, 1–4. Specifically, Aulicino asserts that:

> Cross-examination of Augustine is particularly necessary in light of his undisputed record of mendacity toward the government, and his history of criminal conduct. Counsel must be permitted to probe the subsequent allegations of obstruction. This area of examination will show that the individuals who masterminded the alleged racketeering activity never considered Aulicino to be a part of it; that they used him for discrete acts; that he was deliberately kept uninformed of the greater plan which was being implemented; and that he was never a part of the alleged obstruction because, in essence, he was never a member of their "club" to begin with; thus he was not considered for participation in the obstruction. These points are vital to his defense, particularly when one considers that he is the only defendant who is not incarcerated pending trial. If he were a part of the underlying conspiracy, his codefendants would likely have wanted to use him to locate and intimidate or bribe government witnesses. The truth, however, is that his name probably was never mentioned during any discussion among the codefendants of the alleged obstruction. To deprive Mr. Aulicino of the opportunity to conduct cross-examination on these issues is tantamount to depriving him of a fair trial and ignoring the Sixth Amendment.

*Id.,* 4.

He then argues, somewhat inconsistently, that Augustine probably "fabricated the obstruction allegations [ ] to generate a lenient plea offer. Counsel should be permitted to expose this lie on cross-examination in order further to impeach Augustine." *Id.,* 7 fn. 6.

■ We believe that the evidence sought to be developed is only of marginal relevance, since Aulicino's lack of participation in the obstruction plan can only in the most attenuated sense be probative of non-participation in the charged racketeering acts. The preju-

dicial impact upon the co-defendants, however, is enormous.

We accordingly preclude Aulicino's counsel from cross-examining Augustine on the obstruction matter. We exclude the testimony under Rule 403, finding its prejudicial impact on the case of his codefendants and its potential for causing confusion and waste of time substantially outweigh any marginal probative value it might possess.

We now turn to the defendants' motions.

## I. *Evidence Seized During the Automobile Searches*

Defendants Cleary, Palazzolo, Olivieri, Aulicino, and Ruggiero have challenged two automobile searches which were conducted by New York City Police officers on February 27, 1991. (Benfante Aff. at 54–56;[4] Palazzolo Br. 1–11; Freeman Aff., ¶¶ 28–30; Krakow Aff., ¶¶ 15–22; *see also* Singer Aff. at 2, 6 (stating that Ruggiero joins in "applicable motions" filed by co-defendants)). Although defendants Ruggiero and Cleary were given formal notice in March that the Government was challenging their standing to object to the search of the vehicle in which they were riding, they only today, prior to jury selection, have filed affidavits asserting that an unidentified individual gave them permission to drive the car. The affidavits lack even the sparest of detail, and have about them the irresistible suggestion that technicality and formalism have been served at the expense of substance and justice. Nonetheless, the Government now concedes standing, but insists that these affidavits are insufficient to raise any disputed factual issue requiring a hearing, and we agree.

### A. Relevant Facts

On February 27, 1991, New York City Police Officer Brian Walsh received a radio transmission that suspicious men were parked outside of a residence located at 63–32 Carlton Street, in Rego Park, Queens.[5] The occupants of this residence had been the victims of an invasion robbery several months earlier.

Officer Walsh reported to the scene, and observed a Buick automobile containing three males parked in front of a fire hydrant. Officer Walsh also noticed a temporary registration sticker on the car's windshield. Officer Walsh approached the vehicle and asked the driver for registration and insurance documents. The driver, defendant David Cleary, stated that he did not have any papers for the car, that he had borrowed the vehicle, and that he did not know who owned it. Another officer then observed a bullet inside the vehicle, and the officers then asked all the occupants of the car to get out of the car. In addition to Cleary, the driver, the car contained defendant Louis Ruggiero, Jr., and a man who used the name Charles Johnson.

The officers then conducted a search of the passenger compartment of the vehicle, and recovered a loaded .357 Magnum under the front passenger seat. Officer Walsh also recovered a walkie talkie, rolls of duct tape, and plastic handcuffs inside this vehicle. Cleary—who used the name "Anthony Monti"—Ruggiero and "Johnson" were arrested, and later charged with criminal possession of a weapon.

While the officers were dealing with the Cleary vehicle, a second Buick came down the block. The second vehicle could not pass because Officer Walsh's patrol car was

4. "Benfante Aff." refers to the affidavit of Joseph R. Benfante, sworn to on February 18, 1993, and submitted in support of David Cleary's pretrial motions; "Burke Aff." refers to the affidavit of Patrick T. Burke, sworn to on February 19, 1993, and submitted in support of Michael Palazzolo's pretrial motions; "Freeman Aff." refers to the affidavit of Louis M. Freeman, sworn to on February 22, 1993, and submitted in support of Richard Olivieri's pretrial motions; "Krakow Aff." refers to the affidavit of Robert J. Krakow, sworn to on March 1, 1993, and submitted in support of Robert Aulicino's pretrial motions; "Singer Aff." refers to the affidavit of Gino Josh Singer, sworn to on February 19, 1993, and submitted in support of Louis Ruggiero, Jr.'s pretrial motions; "[Name] Br." refers to a memorandum of law filed by the indicated defendant; "Gardephe Aff." refers to the Affidavit of Paul G. Gardephe, sworn to on March 16, 1993, and filed in opposition to defendants' pretrial motions.

5. This statement of facts is drawn largely from the state grand jury testimony of Officer Walsh. *See* Burke Aff., Exhibit A.

parked next to the Cleary vehicle. Another vehicle then appeared behind the second Buick, and an occupant of this vehicle approached Officer Walsh and stated that the men in the second Buick were "with" the individuals in the first Buick, and that guns would also be found in the second Buick. Officer Walsh then approached the second Buick, noticed that it also had a temporary registration, and observed that its license plate was only four digits "off" from the license plate of the first Buick.

Officer Walsh asked the driver of the second Buick—defendant Richard Olivieri—for registration and insurance documents. Olivieri stated that he had no paperwork concerning the vehicle, and that a friend owned it. Officer Walsh asked Olivieri to get out of the vehicle, and another officer patted down Olivieri. That officer found a fully loaded Glock semi-automatic handgun in Olivieri's waistband. The officers recovered a number of other items from the passenger compartment of this second Buick, including a .45 caliber semi-automatic handgun, a .357 magnum handgun, a walkie talkie which corresponded to the walkie talkie found in the first Buick, two police shields, a pair of handcuffs, and "sap" gloves. The officers arrested Olivieri and defendants Palazzolo and Aulicino, who were passengers in the car. All three were later charged with criminal possession of a weapon. Officer Walsh later learned that both Buicks were purchased several days apart by the same individual from a Bronx dealership, but the officer was unable to "trace" the owner.

**B. Defendant Aulicino Has Failed to Carry His Burden to Demonstrate Standing to Challenge the Warrantless Search of the Automobile in Which He Was Riding**

██ Defendant Aulicino's motion to suppress the evidence seized from the second Buick automobile must be denied, because he has failed to establish that he has standing to challenge the contested search. It is well established that in order to challenge a search, a defendant must submit an affidavit from someone with personal knowledge demonstrating sufficient facts to show that he

had a legally cognizable privacy interest in the searched premises at the time of the search. *See Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *United States v. Paulino,* 850 F.2d 93, 96 (2d Cir. 1988), *cert. denied,* 490 U.S. 1052, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989); *United States v. Arboleda,* 633 F.2d 985, 991 (2d Cir.1980), *cert. denied,* 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981). Aulicino does not claim any property or proprietary interest in the vehicle seized. He does not claim that he owned the vehicle, or had the permission of the owner to use it.

A showing of standing is required under the law because a "person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Illinois,* 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). "Only a defendant whose own privacy has been invaded can exclude evidence taken during the invasion." *United States v. Saint Prix,* 672 F.2d 1077, 1082 (2d Cir.), *cert. denied,* 456 U.S. 992, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982). Moreover, the defendant bears the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure. *Rakas v. Illinois,* 439 U.S. at 131 n. 1, 99 S.Ct. at 424 n. 1; *United States v. Rahme,* 813 F.2d 31, 34 (2d Cir.1987). Because Aulicino has failed to establish a legitimate, reasonable expectation of privacy in the two Buick automobiles, he has no standing to challenge the searches in question.

In *United States v. Ponce,* 947 F.2d 646, 649 (2d Cir.1991), the Second Circuit considered facts similar to those before this Court. The Second Circuit noted that to "mount a challenge to a search of a vehicle, defendants must show, among other things, a legitimate basis for being in it, such as permission from the owner." Defendants "who do not have a legitimate basis for being in a car that is not registered in the name of any of the car's occupants cannot object to the search of the vehicle." Here Aulicino has not alleged a

**392**

"legitimate basis for being in" the vehicle in question.

■ It is also clear that mere occupancy of a car does not demonstrate the required "legitimate basis." The *Ponce* Court commented:

> The fact that defendants were observed using the car does not establish their right to use the car. For example, the car might have been stolen.

*Id.* at 649. The Court emphasized that the burden to establish standing is on the defendant:

> the burden is not on the police to show that defendants were in the car illegitimately. The burden is on the defendants to show a legitimate basis for being in the car.

*Id.* Numerous decisions from this Circuit confirm that mere control over a vehicle does not establish standing. *See, e.g., United States v. Sanchez,* 635 F.2d 47, 64 (2d Cir. 1980) (Defendant "demonstrated neither ownership of the Pontiac nor license from the owner to possess the Pontiac. His possession of the keys was not sufficient to give him a constitutionally protected interest in the privacy of that car. . . . The burden was on [the defendant] to establish standing to object to the search. He failed to do so. . . ."); *United States v. Smith,* 621 F.2d 483, 487 (2d Cir.1980) ("Although Smith was in the driver's seat, he had no driver's license and the car was registered in another's name. He made no showing that he had any legitimate basis for being in the car at all. . . ."). Under *Ponce, Sanchez,* and *Smith,* the fact that Olivieri was driving the second Buick does not begin to establish that he would have standing to challenge a search of the vehicle. Moreover, the Second Circuit has made clear that mere passengers—who have no authority to exclude others from a vehicle—have an even greater hurdle in establishing standing. In *United States v. Paulino,* 850 F.2d 93, 97 (2d Cir.1988), *cert. denied,* 490 U.S. 1052, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989), the Second Circuit held that a passenger in a vehicle that he did not own, lacked standing to challenge the seizure of counterfeit bills he had placed under his feet beneath the car's floor mat. *Id.* Finding that the defendant, as a

passenger, had no reasonable expectation of privacy in the interior of the car, the Second Circuit reversed the District Court's suppression order:

> Although [the defendant] concededly had a possessory interest in the counterfeit money, that is only one factor considered when determining whether his Fourth Amendment rights have been violated. Other factors militate strongly against holding that he had a legitimate expectation of privacy as a passenger in [the owner's] automobile. [The defendant] had only known [the owner of the vehicle] for one week. As a passenger he had no right to exclude others from the vehicle.

*Paulino,* 850 F.2d at 97. Numerous courts applying *Rakas* have held that passenger status—that is, presence in the vehicle with the owner's permission—is insufficient to confer Fourth Amendment standing. *United States v. Grandison,* 780 F.2d 425, 432 (4th Cir.1985); *United States v. Strmel,* 744 F.2d 1086, 1088 (5th Cir.1984); *United States v. Cardillo,* 708 F.2d 29, 30 (1st Cir.), *cert. denied,* 464 U.S. 1010, 104 S.Ct. 531, 78 L.Ed.2d 713 (1983). Here, of course, neither of the passengers, Aulicino and Palazzolo, has even established that they were in the second Buick with the owner's permission.

In response to the Government's argument that he had failed to submit an affidavit based on personal knowledge, Palazzolo submitted an affidavit in support of his pretrial motion. ("Palazzolo Aff."). Nothing in this affidavit raises a factual issue sufficient to justify a factual hearing.

In his affidavit, Palazzolo concedes that on February 27, 1991, he was present in a vehicle driven by Richard Olivieri. Palazzolo further states that police stopped the vehicle in Queens, conducted a search, and arrested the occupants, including Palazzolo. (Palazzolo Aff. ¶ 2). Palazzolo claims that an officer asked Olivieri for "papers relating to ownership of the vehicle," and Olivieri obtained "registration papers for the vehicle" from the glove compartment. *Id.* at ¶ 3.

This factual assertion is entirely inadequate to justify a hearing. A defendant must show that he had a legally cognizable privacy

interest in the searched premises at the time of the search. Palazzolo has failed to claim a property or proprietary·interest in the vehicle searched. Indeed, he has failed to explain how he came to·be in the vehicle in the first place.

Even accepting Palazzolo's claim that Olivieri produced registration documents—a claim denied by the officer in question and a matter about which Palazzolo does not have personal knowledge—neither Palazzolo nor any other defendant alleges that the vehicle was registered in the name of any occupant of the vehicle. In fact, the car was not registered to any occupant of the car.

■ The burden is on Palazzolo to establish a "legitimate basis for being in" the vehicle. *Ponce*, 947 F.2d at 649. Palazzolo's affidavit provides no additional evidence concerning this issue. Palazzolo has offered nothing other than his status as a passenger in the vehicle to establish standing, and the Second Circuit has clearly held that his status is insufficient, because "[a]s a passenger he had no right to exclude others from the vehicle." *United States v. Paulino*, 850 F.2d 93, 97 (2d Cir.1988), *cert. denied*, 490 U.S. 1052, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989).

Defendant Aulicino has filed a reply brief which claims that a hearing is now necessary because Palazzolo's affidavit "demonstrates that Olivieri, Palazzolo and Aulicino were lawfully in the car and have standing to object to a search of it." Defendant Robert Aulicino's Reply Memorandum of Law In Support of Pre–Trial Motions, at pp. 7–8. Palazzolo's affidavit, of course, utterly fails to provide any information demonstrating that Olivieri, Palazzolo and Aulicino were legitimately in the Buick. Even if Olivieri could establish that he had lawful custody of the vehicle, Aulicino—as a mere passenger— would still lack standing to object to a search of the vehicle.

In *United States v. Padilla*, —— U.S. ——, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993), the Supreme Court confronted a Ninth Circuit case holding that a co-conspirator "obtains a

legitimate expectation of privacy for Fourth Amendment purposes if he has either a supervisory role in the conspiracy or joint control over the place or ·property involved in the search." The Supreme Court reversed, reaffirming that defendants must demonstrate a "legitimate expectation of privacy in the area searched." In reversing, the Court reaffirmed its holding in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), where the Court concluded that passengers in a car had no standing to challenge the seizure of a rifle and ammunition from that car.

Because defendant Aulicino has failed to carry his burden to establish standing, his motion to suppress evidence seized from the second Buick must be denied. *See also United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (defendants have no standing to challenge a search and seizure of evidence from an apartment rented by the mother of one of the defendants); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (defendants have no standing to challenge the seizure of evidence from a car in which they were riding, but which they did not own).

### C. Even Assuming Standing as to All Three Defendants, There Is No Basis for Suppressing the Seized Evidence

Even granting standing to challenge the automobile searches here, defendants motions to suppress must still fail.

■ Initially, no defendant·submitted an affidavit based on personal knowledge concerning the circumstances of the search. The defendants submitted attorney's affidavits alleging certain facts "upon information and belief." *See, e.g.*, Benfante Aff. at 54–55; Freeman Aff. at ¶¶ 29–30. Such affidavits are completely inadequate to raise a factual issue justifying a hearing: "In order to raise a factual issue concerning the validity of a seizure such that a hearing is required, the defendant must support his claim with an affidavit based on personal knowledge." *United States v. Vasta*, 649 F.Supp. 974, 986 (S.D.N.Y.1986); *see also United States v.*

*Gillette,* 383 F.2d 843, 848 (2d Cir.1967) ("The affidavit submitted for appellant is insufficient in that it does not, for example, allege personal knowledge on the part of appellant's attorney; accordingly, there was no factual issue to be resolved and the denial of a hearing was correct."); *United States v. Viscioso,* 711 F.Supp. 740, 745 (S.D.N.Y.1989) ("the defendant must show 'that disputed issues of material fact exist before an evidentiary hearing is required'.... The required showing must be made by an affidavit of someone with personal knowledge of the underlying facts."); *United States v. Caruso,* 684 F.Supp. 84, 87 (S.D.N.Y.1988); *United States v. Gregory,* 611 F.Supp. 1033, 1044 (S.D.N.Y.1985) (Weinfeld, J.). Accordingly, their motions to suppress fail on this ground alone. Even if this Court were to reach the question of Officer Walsh's conduct, however, it would find that his actions were entirely proper.

■ Officer Walsh approached the first Buick after receiving a radio call concerning a carload of suspicious men outside a residence which had been previously robbed. The car was illegally parked and did not bear a proper registration sticker. When Officer Walsh asked Cleary, the driver of the first car, for registration and insurance documents, Cleary was unable to produce either, and denied even knowing who the owner of the vehicle was. "Section 401(4) of the New York Vehicle and Traffic Law requires any motorist to produce, upon demand of a police officer, the registration certificate of the automobile that he is driving.... Failure to produce a valid registration creates a rebuttal presumption of operating an unregistered vehicle in violation of New York Vehicle and Traffic Law § 401(4)." *United States v. Rosario,* 417 F.Supp. 80, 81–82 (S.D.N.Y. 1976). On these facts, Officer Walsh was authorized to arrest Cleary for unauthorized use of a motor vehicle and to impound the vehicle he was driving. *See* N.Y. Penal Law § 165.05 (unauthorized use of a motor vehicle

in the third degree); *United States v. Rosario,* 417 F.Supp. at 82; *People v. Gonzalez,* 62 N.Y.2d 386, 477 N.Y.S.2d 103, 465 N.E.2d 823 (1984) (where driver is arrested police are authorized to impound vehicle and conduct an inventory search); *People v. Shepley,* 185 A.D.2d 862, 587 N.Y.S.2d 368 (2d Dept. 1992) (seizure and search of vehicle proper where driver failed to produce registration); *People v. Galak,* 182 A.D.2d 702, 582 N.Y.S.2d 469 (2d Dept.1992) (vehicle properly searched where driver was arrested after failing to produce license, registration and proof of insurance); *People v. Robinson,* 36 A.D.2d 375, 320 N.Y.S.2d 665 (2d Dept.1971) (vehicle properly impounded and searched where driver could not produce registration or proof of insurance); *People v. Griffin,* 116 Misc.2d 751, 456 N.Y.S.2d 334 (1982) (police authorized to arrest driver and impound vehicle where driver could not produce license or registration).

It is well established that "'when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.'" *United States v. Perea,* 986 F.2d 633, 643 (2d Cir.1993) (quoting *New York v. Belton,* 453 U.S. 454, 457, 101 S.Ct. 2860, 2862, 69 L.Ed.2d 768 (1981)). Accordingly, Officer Walsh's search of the Cleary vehicle would have been entirely proper as a search incident to a lawful arrest. Having observed a bullet in the rear of the car, however, the police had probable cause to search the vehicle, and any containers inside the vehicle, even in the absence of Cleary's arrest. *California v. Acevedo,* —— U.S. ——, ——, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (permitting the warrantless search of a movable vehicle where there is probable cause to believe that the vehicle contains contraband or other evidence of a crime).[6]

---

6. Since *Carroll,* warrantless searches of automobiles have repeatedly been upheld by the Supreme Court where supported by probable cause. *See, e.g., United States v. Johns,* 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985) (upholding warrantless seizure of vehicle which agents had

probable cause to believe contained contraband, and warrantless search conducted three days later of packages contained in vehicle); *Michigan v. Thomas,* 458 U.S. 259, 261, 102 S.Ct. 3079, 3080–81, 73 L.Ed.2d 750 (1982) (upholding warrantless seizure and search of vehicle which had

■ Officer Walsh's initial approach to the second Buick was also entirely lawful. After recovering the firearm from the first Buick·and arresting the occupants, Officer Walsh observed a very similar second Buick, bearing a nearly identical license plate and a temporary registration, approaching the first Buick. The second Buick had a broken rear window. Police are authorized to stop vehicles which are improperly registered and which have a broken or cracked windshield. *People v. Meyers*, 139 A.D.2d 601, 527 N.Y.S.2d 93 (2d Dept.1988); *People v. Kim*, 154 Misc.2d 346, 585 N.Y.S.2d 310 (Sup.Ct. Queens Cty.1992). Moreover, a bystander approached Officer Walsh and told the officer that the occupants of the second Buick were "with" the arrested individuals in the first Buick, and that the second Buick's occupants also had guns. Under these circumstances, Officer Walsh certainly had a "reasonable suspicion of criminal activity," even absent the traffic law violation. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[7]

Officer Walsh asked the driver of the second Buick, defendant Richard Olivieri, for registration and insurance documents. Olivieri, like Cleary, was unable to produce any paperwork concerning the car he was driving. Having probable cause now to arrest Olivieri for unauthorized use of a motor vehicle, *see* N.Y. Penal Law § 165.05, *United States v. Rosario*, 417 F.Supp. at 82, *People v. Griffin*, 116 Misc.2d 751, 456 N.Y.S.2d 334 (1982), Officer Walsh asked Olivieri to get out of the car. A patdown revealed that Olivieri had a loaded semi-automatic handgun in his waistband. Officer Walsh then had

probable cause to arrest Olivieri for criminal possession of a weapon. In accordance with the aforementioned principles, the subsequent search of the Olivieri vehicle was entirely proper both as a search incident to a lawful arrest and as an inventory search. *United States v. Perea*, 986 F.2d at 643; *New York v. Belton*, 453 U.S. at 457, 101 S.Ct. at 2862; *People v. Shepley*, 185 A.D.2d 862, 587 N.Y.S.2d 368 (2d Dept.1992).

Defendants have offered no factual basis or legal theory justifying suppression of the evidence seized during the automobile searches. Accordingly, their motions to suppress this evidence are summarily denied without a hearing.

## II. *Evidence Implicating Identification Procedures*

■ Basing their motions entirely on speculation, Aulicino, Cleary, Palazzolo and Olivieri demand a pretrial hearing concerning the procedures by which photo arrays were shown to witnesses, and the reliability of the witnesses' identifications. Because defendants have failed to make any showing that the procedures used were suggestive, and because any questions concerning the reliability of witnesses' identifications can be properly raised on cross-examination, no pretrial hearing is required.

In order to prevail on their motions to suppress the identification evidence, the defendants are required to show, first, that the pretrial identification procedure was unnecessarily suggestive, and second, that "in all the circumstances, there is 'a very substan-

been towed to police station and was in police custody: "the justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or ... tampered with, during the period required for the police to obtain a warrant"); *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (upholding warrantless search of automobile and closed packages contained therein); *Colorado v. Bannister*, 449 U.S. 1, 101 S.Ct. 42, 66 L.Ed.2d 1 (1980) (per curiam) (upholding warrantless search of vehicle stopped for speeding); *Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970) (warrantless search of seized get-away car held proper: "the car is movable,

the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained"). Similarly, numerous cases in this Circuit have upheld warrantless searches of vehicles supported by probable cause. *See, e.g., United States v. Cruz*, 834 F.2d 47 (2d Cir.1987) (warrantless search of vehicle proper when agents have probable cause to believe it contained contraband); *United States v. Vassiliou*, 820 F.2d 28 (2d Cir.1987) (same).

7. In parking next to the first Buick, Officer Walsh had unintentionally blocked the road. Blocking a vehicle does not convert a *Terry* stop into an arrest, however. *United States v. Perea*, 986 F.2d 633, 644 (2d Cir.1993); *United States v. Vasquez*, 638 F.2d 507, 522 (2d Cir.1980).

tial likelihood of irreparable misidentification' " at trial. *United States v. Maldonado-Rivera,* 922 F.2d 934, 973 (2d Cir.1990), *cert. denied,* ── U.S. ──, 111 S.Ct. 2858, 115 L.Ed.2d 1025, 1026 (1991) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)); *see Stovall v. Denno,* 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). Because defendants—who have received copies of the photo arrays [8]—fail to make a threshold showing of suggestiveness, no hearing is required. *See United States v. Leonardi,* 623 F.2d 746, 755 (2d Cir.1980) (trial court was correct in not requiring pretrial testimony of identifying witnesses where there was no threshold showing of suggestiveness), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980).

Two of the defendants "support" their motion with the speculative claim that witnesses who identified the defendants were shown a single photograph to suggest which individual to pick out of a subsequent photo array. (Cleary Br. 13; Olivieri Br. 59). Palazzolo demands a hearing without making *any* claim whatsoever that relates to the identification procedures. Aulicino claims that the identifications obtained were "questionable" (Aulicino Br. 5), and moves for suppression of any testimony relating to identification. (Krakow Aff., ¶ 7). Aulicino simultaneously maintains, however, that he has no basis to determine whether the "identification was unnecessarily suggestive." (Aulicino Br. 6).

We are advised that five witnesses whom the Government expects will identify the defendants at trial were shown photo arrays. *See* Affidavit of Detective Joseph Marrero ("Marrero Aff.") at ¶ 2, attached as Exhibit A to Gardephe Aff.; Affidavit of Detective Angelo Cioffi ("Cioffi Aff.") at ¶ 2, attached as Exhibit B to Gardephe Aff. With one exception, the investigating detectives asked the witnesses to view only photo arrays. (Marrero Aff., ¶ 3; Cioffi Aff., ¶ 3). In one instance, approximately two months before being shown the photo arrays, a witness was shown single photographs of the defendants,

among others. (Marrero Aff., ¶ 3). Because that witness had observed or met on numerous occasions with the defendants he/she identified, the witness had an independent basis from which to recognize the defendants that existed before he/she saw the photographs. (Marrero Aff., ¶ 3). Although the defendants baselessly speculate that improperly suggestive techniques were used before displaying the photo arrays to witnesses, no defendant claims that the photo arrays themselves are in any way suggestive.

■ Even assuming that the facts are as defendants suggest, a pretrial determination is neither necessary nor appropriate in this case. As an initial matter, the Constitution does not require trial courts to hold pretrial hearings concerning the suggestiveness of an identification procedure. *Watkins v. Sowders,* 449 U.S. 341, 349, 101 S.Ct. 654, 659, 66 L.Ed.2d 549 (1981). Whether to hold such a hearing is a matter within the trial court's discretion. *See United States v. Archibald,* 734 F.2d 938, 940 (2d Cir.), *modified on rehearing on other issues,* 756 F.2d 223 (2d Cir.1984); *see also United States v. Smith,* 546 F.2d 1275, 1279 (5th Cir.1977) (leaving decision in discretion of trial court).

A pretrial hearing in this case is not appropriate because the defendants' concerns can be satisfied at trial. The Supreme Court has concluded that a court is not required to conduct an evidentiary hearing on identification testimony outside the jury's presence. *Watkins v. Sowders,* 449 U.S. at 349, 101 S.Ct. at 659. Because determinations of reliability are traditionally put to the jury, the Supreme Court has held that conducting such a hearing in the jury's presence is constitutionally permissible. *Id.* at 348–49, 101 S.Ct. at 659. Defendants' due process rights and the reliability of the identification evidence can be ensured through the "time-honored process of cross-examination"—"the device best suited to determine the trustworthiness of testimonial evidence." *Watkins v. Sowders,* 449 U.S. at 349, 101 S.Ct. at 659.

---

**8.** Copies of the photo arrays were provided to the defendants on or about December 7, 1992. Gardephe Aff., ¶ 2.

Accordingly, the motion for a pretrial hearing on the reliability of the anticipated in court identifications is denied.

### III. Evidence Seized from Defendant Olivieri's Apartment

Since the defendant Olivieri is alone possessed of standing to challenge the search of his apartment at 1130 Stadium Avenue, and since he has pleaded guilty and withdrawn his pretrial motions attacking the admissibility of this evidence, his claim of illegality in the seizure of this evidence is moot, and the remaining defendants are without standing to assert it. We observe parenthetically that Olivieri's papers are utterly bereft of any non-speculative substance that would justify the *Franks* hearing that he demanded.

### IV. The Severance Motions

Defendant Aulicino has moved for a severance based upon *Bruton v. United States,* 391 U.S. 123, 137, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476 (1968) on the ground that the Government intends to introduce at trial a pre-arrest, hand-written statement of Olivieri that implicates Aulicino. *Bruton,* and its progeny, do not reach pre-arrest statements. In any case, since Olivieri has pleaded guilty and the parties agree that no Bruton issue remains, Aulicino's motion is, in large measure moot, and to the extent that it continues to be pressed on other grounds, it is denied as insufficiently supported. The severance motions of Ruggiero and Cleary are mooted on their principal ground in light of the Court's ruling herein precluding Aulicino's proposed cross-examination of Augustine relating to the obstruction matter. To the extent that they press their severance claim on other, more general grounds, it is denied as insufficiently supported. We observe finally that the Government expects to complete its case against the remaining three defendants in no more than four weeks.

### V. Further Discovery and Bills of Particulars

For the reasons convincingly stated in the Government's Memorandum of Law In Opposition to Defendants' Pretrial Motions, dated March 16, 1993, 27–44, the defendants' demands for further disclosure of the Government's evidence, except as consented to by the Government, are denied.

### VI. Striking of Aliases from Indictment

Cleary has moved to strike all aliases from the Indictment, arguing that these references are irrelevant and prejudicial surplusage. (Benfante Aff. at 57). The Second Circuit has allowed the use of aliases, where relevant to the anticipated proof at trial. *See, e.g., United States v. Miller,* 381 F.2d 529 (2d Cir.1967), *cert. denied,* 392 U.S. 929, 88 S.Ct. 2273, 20 L.Ed.2d 1387 (1968). The appropriate standard of relevance is set out in *United States v. Clark,* 541 F.2d 1016, 1018 (4th Cir.1976):

If the Government intends to introduce evidence of an alias and the use of that alias is necessary to identify the defendant in connection with the acts charged in the indictment, the inclusion of the alias is both relevant and permissible.

At trial, the Government asserts that it will prove that Cleary used the nicknames "Heavy D" and "Anthony Monti" at the time of the events referred to in the indictment. Proof of these nicknames and aliases will be necessary to identify him as the individual who engaged in various acts charged in the indictment. For example, the Government states that it will offer proof at trial that when confronted by police outside kidnapping victim Jorge D'Avila's residence, Cleary identified himself as "Anthony Monti." Proof that Cleary used a false name is obviously highly relevant, as it demonstrates consciousness of guilt. Similarly, Cleary's Jaguar carried a vanity license plate bearing the name "Heavy D." Testimony at trial concerning this license plate and Cleary's use of this name will, according to the Government, assist the jury in finding Cleary's participation in certain of the charged offenses. Similarly, the Government states that references to other defendants' aliases are used in taped conversation which will be offered at trial, and because witnesses will use these aliases in discussing the defendants' conduct at trial, they are relevant.

As the court observed in *United States v. Esposito*, 423 F.Supp. 908, 911 (S.D.N.Y. 1976), "inclusion of the alias[es] in the indictment is proper and, indeed, may well serve to obviate jury confusion." *See also, United States v. Ianniello*, 621 F.Supp. 1455, 1479 (S.D.N.Y.1985) (Weinfeld, J.), *aff'd* 808 F.2d 184 (2d Cir.1986); 1 Wright, *Federal Practice and Procedure*, § 127 at 427–28 n. 28 (1982) (collecting cases). The motion to strike aliases from the indictment is therefore denied.

## VII. Audibility Hearing

Without citing any particular tapes or transcripts, defendant Cleary requests a hearing "to determine the intelligibility of tapes and the accuracy of transcripts" that the Government intends to offer at trial. (Benfante Aff. at 34).

He has, however, failed to identify any tape which is inaudible, or any transcript which is inaccurate. Under these circumstances, he has provided no justification for a pretrial hearing concerning this issue, and, accordingly, his application for an audibility hearing is denied.

We now turn to the defendants' motion to suppress electronic surveillance evidence.

## VIII. The Wiretap Evidence

The Government states that it intends to introduce at trial tape recordings of conversations intercepted over David Cleary's telephone—located at 33 Oak Street, Hackensack, New Jersey—and over Louis Ruggiero, Jr.'s telephone—located at 451 Borough Lane, Palisades, New Jersey. These conversations were intercepted in April, May, and June 1991 by investigators assigned to the office of John J. Fahy, the Bergen County Prosecutor, pursuant to orders issued by New Jersey Superior Court judges.

■ Although the tape evidence at issue was obtained by New Jersey state investigators acting pursuant to wiretap orders issued by New Jersey state court judges, the appropriate standard of probable cause for deciding defendants' motions here is the federal "totality of the circumstances" test. In *United States v. Rowell*, 903 F.2d 899 (2d Cir.1990), the Second Circuit confronted wiretap evidence obtained by the Monroe County district attorney pursuant to a wiretap order signed by a county court judge. The Court explicitly rejected Rowell's claim that New York state law should govern his lack of probable cause claim, rather than federal law:

> In *United States v. Pforzheimer*, 826 F.2d 200, 202 (2d Cir.1987), we addressed the issue of "whether the state or federal exclusionary rule should be applied in ruling on a motion to suppress evidence in a criminal trial in federal court when the evidence in question was solely the product of a state investigation." We concluded that "federal law should apply to ... federal criminal prosecution[s], *even though the underlying investigation leading to prosecution was conducted solely by state officials.*" *Id.* at 204.... As the opinions in *Pforzheimer* and *Nersesian* make clear, the appropriate standard of probable cause for determining Rowell's motion to suppress the wiretap evidence is the federal "totality of the circumstances" standard.

*United States v. Rowell*, 903 F.2d at 901 (emphasis in original). Accordingly, defendants' motions to suppress here are governed by the federal "totality of the circumstances" test.

■ Probable cause to issue a wiretap order exists when the facts made known to the issuing court are "sufficient to warrant a prudent man in believing" that evidence of a crime could be obtained through the use of electronic surveillance.[9] *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 224, 13 L.Ed.2d 142 (1964); *United States v. Fury*, 554 F.2d 522, 530 (2d Cir.1977), *cert. denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978); 18 U.S.C. § 2518(3).

---

**9.** It is well settled that the standard for probable cause necessary to secure a wiretap order is precisely the same as that required for a regular search warrant. *United States v. Wagner*, 989 F.2d 69, 71 (2d Cir.1993); *United States v. Biagi*, 853 F.2d 89 (2d Cir.1988), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989); *United States v. Fury*, 554 F.2d 522, 530 (2d Cir.1977), *cert. denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978).

The issuing judicial officer must "make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that ... evidence of a crime will be found...." The quanta of proof necessary to establish probable cause is "only the probability, not a prima facie showing, of "criminal activity...."

*United States v. Wagner*, 989 F.2d 69, 72 (2d Cir.1993) quoting *Illinois v. Gates*, 462 U.S. 213, 235, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 (1983); *see also United States v. Nersesian*, 824 F.2d 1294, 1306 (2d Cir.), *cert. denied*, 484 U.S. 957, 1061, 108 S.Ct. 355, 1018, 98 L.Ed.2d 380, 983 (1988); *United States v. Travisano*, 724 F.2d 341, 345–46 (2d Cir. 1983); *United States v. Fury*, 554 F.2d at 530; *United States v. Shipp*, 578 F.Supp. 980, 985 (S.D.N.Y.1984), *aff'd sub. nom. United States v. Wilkinson*, 754 F.2d 1427 (2d Cir.), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). Furthermore, "facts ostensibly sufficient to establish probable cause ... are not negated simply because such facts also may be consistent with the suspect's innocence." *United States v. Webb*, 623 F.2d 758, 761 (2d Cir.1980).

█ The affidavit supporting the application for electronic surveillance must be read as a whole, and construed in a realistic and common-sense manner, so that its purpose is not frustrated. *United States v. Harris*, 403 U.S. 573, 577–579, 91 S.Ct. 2075, 2079–80, 29 L.Ed.2d 723 (1971). As the Supreme Court stated in *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983), probable cause is a "practical, non-technical conception." Courts should not "read supporting affidavits with the same microscopic intensity as municipal bond counsel would a bond indenture." *United States v. Pond*, 523 F.2d 210, 214 (2d Cir.1975), *cert. denied*, 423 U.S. 1058, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976). Accordingly, wiretap affidavits must be read as a whole with each fact "gaining color from" the others. *United States v. Monica*, 295 F.2d 400, 401 (2d Cir.1961), *cert.*

*denied*, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962).

█ Wiretap orders, like search warrants, are entitled to a presumption of validity. *United States v. Fury*, 554 F.2d at 530. A reviewing court "must accord substantial deference to the finding of an issuing judicial officer that probable cause exists." *United States v. Wagner*, 989 F.2d at 72; *see also United States v. Travisano*, 724 F.2d 341, 345 (2d Cir.1983). "The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause." *United States v. Wagner*, 989 F.2d at 72. Courts have long recognized the presumption that judges "will scrutinize any application and will scrupulously impose the restrictions required by statute." *United States v. Masciarelli*, 558 F.2d 1064, 1068 (2d Cir.1977), quoting *United States v. Tortorello*, 480 F.2d 764, 783 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). Thus, substantial deference must be given to the prior judicial determination of probable cause, and any doubts should be resolved in favor of upholding the authorization. *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964); *United States v. Nersesian*, 824 F.2d at 1305; *United States v. Londono*, 553 F.2d 805, 810 (2nd Cir.1977).

█ Each of these principles has been forcefully reiterated by the Supreme Court in *Illinois v. Gates*. In defining "probable cause," the Court emphasized that it "means less than evidence which would justify conviction" and is far more comparable to evidence "which warrant[s] suspicion." 462 U.S. at 235, 103 S.Ct. at 2330 (citations omitted). Likewise, the Court strongly reminded lower courts that "[t]echnical requirements of elaborate specificity ... have no proper place in this area," and that an issuing court's "determination of probable cause should be paid great deference by reviewing court." *Id.* at 236, 103 S.Ct. at 2331; *see also Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983).[10] The ultimate

10. As the Supreme Court emphasized in *United States v. Leon*, 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1984), "[r]easonable minds frequently differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by

standards is simply whether there was a "substantial basis" for the issuing judge's determination of probable cause. *Illinois v. Gates,* 462 U.S. at 236, 103 S.Ct. at 2331; *see also United States v. Nersesian,* 824 F.2d at 1306.

■ Finally, even if the reviewing court determines that probable cause was lacking, the drastic remedy of suppression is proper only where (1) the judicial officer issuing the warrant abandoned his or her detached, neutral role, or (2) the agent was dishonest or reckless in preparing the affidavit supporting the issuance of the wiretap order, or (3) the agent's reliance on the warrant was not objectively reasonable. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

Measured under these standards, defendants' contention that New Jersey Superior Court Judge Grossi erred in finding probable cause is plainly without merit.

■ The first wiretap order for Cleary's telephone was issued on the basis of an affidavit executed by Investigator John J. Maurizi of the Bergen County Narcotic Task Force on April 25, 1991. *See* Affirmation of Paul G. Gardephe, dated June 3, 1993 ("Gardephe Aff."), Exhibit A. After reviewing Maurizi's affidavit, Judge Grossi issued an order on April 25, 1991, authorizing the interception of communications over Cleary's telephone for a period of twenty days. Gardephe Aff., Exhibit B. Judge Grossi found probable cause to believe that David Cleary had engaged in, and was continuing to engage in, a criminal conspiracy involving violations of New Jersey's laws concerning controlled substances, conspiracy, gambling, robbery, arson, and homicide, and that there was a probable cause to believe that evidence concerning his criminal activity would be obtained over a wiretap on Cleary's telephone.[11] Gardephe Aff., Exhibit B, at 2–3.

The Maurizi affidavit provided an ample basis for Judge Grossi's probable cause finding that Cleary was involved in trafficking in

controlled substances. Investigator Maurizi's affidavit explained that his investigation of Cleary began with information received from a confidential informant. The informant—who was not a defendant in any criminal action—told Maurizi that friends involved in narcotics trafficking had told him that large quantities of cocaine were being distributed from 33 Oak Street, Apartment 4, Hackensack, New Jersey. Based on the informant's tip, Investigator Maurizi conducted surveillance at the Oak Street address. Maurizi observed a 1989 black Jaguar convertible bearing New Jersey registration "HEAVY D" parked in the driveway. Motor vehicle records revealed that David Cleary of 33 Oak Street, Apartment 4, Hackensack, New Jersey, was leasing the Jaguar. Gardephe Aff., Exh. A, at 6–7.

Investigator Maurizi then conducted a criminal record check concerning David Cleary. Maurizi learned that Cleary had an extensive criminal record, including a 1983 felony conviction for distribution of cocaine, and a 1985 felony conviction for possession of cocaine with the intent to distribute it. Maurizi also learned that federal firearms charges were pending against Cleary in New Jersey arising from his possession of a handgun and hollow point bullets in Palisades Park, and that firearms charges were pending against Cleary in Queens County, New York, based on his February 27, 1991 possession of a firearm. *Id.* at 7–8.

Maurizi learned from other law enforcement agents that Cleary's prior narcotics convictions had involved extensive use of his telephone. One of his convictions had arisen from numerous sales of cocaine to an undercover investigator of the Bergen County Narcotic Task Force. Cleary had instructed the undercover officer to contact him by telephone to order cocaine. During the investigation, the undercover officer placed six telephone calls to Cleary, and all the calls resulted in purchases of cocaine from Cleary. *Id.* at 16.

according 'great deference' to a magistrate's determination."

11. The wiretap order authorized interception of communications occurring over four telephone

numbers, all of which were assigned to David Cleary at 33 Oak Street, Apartment 4, Hackensack, New Jersey.

Records obtained from New Jersey Bell Telephone Company revealed that four telephone numbers were listed to 33 Oak Street, Apartment 4, Hackensack, New Jersey, and that all four numbers were either listed to, or billed to, David Cleary. Cleary's telephone use was extraordinary—telephone company records indicated that his bills for a three-month period during late 1990 and early 1991 exceeded $900.00. *Id.* at 9–10.

Physical surveillance revealed that Cleary met with a number of documented narcotics traffickers. For example, on January 24, 1991, Investigator Maurizi observed a black Porsche bearing New York registration parked in Cleary's driveway. The Porsche was registered to Gus Papasophocles, who was convicted of possession of cocaine with intent to distribute it in 1985. On January 30, 1991, Investigator Maurizi observed Cleary and a female meet with Papasophocles at a Hackensack diner. The three left the diner, and Cleary and Papasophocles entered Papasophocles' Porsche, while the female entered Cleary's Jaguar. Both vehicles were then driven away. Later that day, Cleary was observed entering his Jaguar and driving repeatedly past his residence and around neighboring side streets, apparently in an effort to detect surveillance. *Id.* at 11–13, 41.

A review of Cleary's telephone records for the period between September 4, 1990, and March 4, 1991, revealed numerous recent contacts with documented narcotics violators. For example, Cleary called a number listed to 24 Stuyvesant Avenue, Kearny, New Jersey on fourteen occasions during this period. Telephone records and motor vehicle records indicated that James and John Hodnett resided at this location. James Hodnett was charged in 1984 with possession of marijuana and received a conditional discharge. In 1988, James Hodnett was arrested and charged with controlled substance offenses, although these charges were later dismissed. John Hodnett had been arrested in 1978 and charged with possession of marijuana (the charge was later dismissed) and was under indictment at the time of Maurizi's affidavit for possession of more than fifty grams of marijuana. *Id.* at 27–28.

Cleary's telephone records also revealed eight telephone conversations with Anthony Pezzino of 18 Weaver Avenue, Bloomfield, New Jersey. Pezzino had a 1988 arrest of possession of marijuana, for which he received a conditional discharge. *Id.* at 28–29.

Cleary's telephone records also revealed contact with Roger Lentz of 877 Schuyler Avenue, Apartment 49, Kearny, New Jersey. Lentz had been arrested in February 1984 and charged with possession of cocaine, for which he received a conditional discharge. In October, 1989, Lentz was indicted for possession of cocaine, for maintaining and operating a controlled dangerous substance production facility, for kidnapping, and for assault and criminal restraint. Those charges were pending at the time of Maurizi's wiretap application. *Id.* at 30–31.

Cleary's telephone records also revealed contact with Garnell Cottman of 2267 Kennedy Boulevard, Jersey City, New Jersey. Cottman was convicted in 1989 of failure to surrender controlled dangerous substances. *Id.* at 32.

Cleary's telephone records also revealed calls to a residence located in Hawthorne, Florida. The number at this residence was listed to Anthony and Ann Raftopoulis of 186 Elm Street, Englewood, New Jersey. Jerry Raftopoulis, who resided at that address, was arrested in 1985 for possession of a controlled dangerous substance with intent to distribute. In 1988, a violation of probation warrant was issued for Raftopoulis based on his possession of cocaine with the intent to distribute it. This warrant was active at the time of Investigator Maurizi's wiretap application.

Based on the informant's tip that large amounts of cocaine were being sold out of Cleary's apartment, Cleary's two prior convictions for narcotics trafficking, his prior use of his telephone to facilitate narcotics trafficking, his two recent arrests for firearms possession (including one arrest on February 27, 1991), his frequent and recent contacts with convicted narcotics traffickers, the unusually high volume of calls over his telephone, his own surveillance conscious activity, and his possession of an asset demon-

strating wealth—his Jaguar automobile—Judge Grossi had a more than adequate basis for determining that there was probable cause to believe that Cleary was engaged in trafficking in controlled substances, and that evidence concerning this activity would be obtained from a wiretap on Cleary's telephone.

Ruggiero's argument that Cleary's two prior felony convictions for cocaine trafficking were entitled to "little weight" (Ruggiero Br. 19) is flatly wrong. The Second Circuit has clearly stated that "[p]rior convictions are a relevant consideration in determining probable cause." *United States v. Wagner,* 989 F.2d at 73; *see also United States v. Rowell,* 903 F.2d 899, 903 (2d Cir.1990); *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960) ("that petitioner was a known user of narcotics made the charge against him much less subject to skepticism than would be such a charge against one without such a history"). Ruggiero's argument that the prior convictions "for the most part bore little relationship to the offenses for which eavesdropping was sought" (Ruggiero Br. 19–20) is similarly misplaced. The first offense listed in Judge Grossi's wiretap order was "distribution of controlled dangerous substances." *See* Gardephe Aff., Exhibit B, at 3.

Judge Grossi's determination that probable cause existed to believe that Cleary was involved in conspiracy, robbery, homicide and gambling activities was equally well supported by Maurizi's affidavit. Maurizi's review of Cleary's telephone records revealed that more than 270 telephone calls were placed from Cleary's telephone to a telephone listed to Richard Olivieri during the period between September 4, 1990, and March 4, 1991. A pen register on Cleary's telephone indicated that Cleary had called Olivieri as recently as six days before the wiretap application. Investigator Maurizi learned from New York City police officers that Olivieri had been arrested in Queens, New York, on February 27, 1991, with Cleary, and that both men were charged with criminal possession of a weapon. Cleary used the name "Anthony Monti" at the time of his arrest. Maurizi's affidavit fully recounts the evidence recovered by the New York City police from Cleary, Olivieri and their associates at the time of their arrest in Queens. This evidence included:

a cocked and loaded Colt .45;

a loaded Glock 9 mm. handgun;

a loaded Charter Arms .357 Magnum handgun;

an unloaded Smith and Wesson .357 Magnum handgun;

two police badges;

handcuffs;

plastic tie wraps; and

two rolls of duct tape.

Two Motorola walkie-talkies were also recovered: one was found in the vehicle driven by Cleary; the other was found in Olivieri's vehicle.

Investigator Maurizi's affidavit noted that the Queens police had discovered Cleary and Olivieri outside a residence located at 63–32 Carlton Street after receiving a radio call concerning a suspicious vehicle parked outside that residence. Maurizi also noted that Jorge Davila, a "known large scale 'bookmaker' in Queens" lived at this residence. That Davila was the target was confirmed by a March 1, 1991 telephone call he received from an individual using the name "Mike." Mike stated that he was calling about the incident outside Davila's home a few days earlier, and told Davila that "we wanted to kidnap you but we failed." Mike threatened Davila's operations and his children, and demanded $200,000. Maurizi also named the individuals arrested with Cleary and Olivieri, and noted that several had criminal records for crimes involving firearms and controlled substances. *Id.* at 17–25, 35–36.

Cleary's arrest with Olivieri on February 27, 1991, the highly incriminating evidence seized from Cleary, Olivieri and their associates at that time, Cleary's use of a false name, and the enormous amount of telephone traffic between Cleary and Olivieri prior to the February 27th arrest, provided Judge Grossi with overwhelming probable cause to believe that Cleary was involved in numerous crimes, including conspiracy, robbery, and kidnapping, and that evidence of this criminal

activity would likely be revealed by a wiretap on Cleary's telephone.

Investigator Maurizi's affidavit also provided probable cause to believe that Cleary was engaged in illegal gambling activities. Cleary's telephone records revealed a telephone call on April 18, 1991 to the residence of Paul Mancuso. Physical surveillance revealed that on February 28, 1991, Paul Mancuso's vehicle was observed outside Cleary's residence. Mancuso has a 1986 felony conviction for gambling. In a March 1991 interview, Mancuso told a Bergen County investigator that he was involved in a large scale bookmaking operation, and that he owed approximately $10,000–$15,000 to bookmakers. Another Bergen County investigator, acting in an undercover capacity, was told by a narcotics trafficker that the trafficker had contemplated hiring David Cleary to collect a debt owed to him by a bookmaker. The drug dealer indicated that Cleary was in the business of collecting gambling debts. After the drug dealer told the bookie that he was going to hire Cleary to collect the debt, the bookmaker paid the debt. Cleary's role as an "enforcer" was corroborated not only by the weapons found at the time of his arrest on February 27, 1991, but also by a 1989 arrest for possession of brass knuckles. *Id.* at 8–10, 13–14, 35.

Other information presented by Investigator Maurizi indicated that Cleary had used his telephone in connection with an arson attempt. In March 1991, Maurizi received information that former employees for Cleary—women who had worked for him selling roses in nightclubs—had received telephone threats from Cleary. The women had started their own rose business after leaving Cleary. Cleary told the women that it would be dangerous for them to continue selling roses in nightclubs. Harassing calls to the women were traced by the telephone company to Cleary's telephone. Prior to these calls, a boyfriend of one of the women had observed a white male fitting Cleary's description pouring gasoline into a truck owned by his girlfriend. Police discovered that the truck was soaked in gas, and observed a lit cigarette attached to a package of matches inside the truck. *Id.* at 15–16.

In sum, Investigator Maurizi's affidavit provided overwhelming evidence that Cleary had been, and was at the time, engaged in wide-ranging criminal activity involving controlled substances, violent crimes—including kidnapping, robbery, and arson—as well as gambling offenses. Furthermore, Cleary's telephone records provided strong evidence that he had utilized his telephone to facilitate his commission of these crimes.

Even were this Court to conclude that Judge Grossi's probable cause finding was erroneous with respect to each of the myriad crimes discussed in the Maurizi affidavit, there is not a hint in the record that the Bergen County investigators' reliance on Judge Grossi's probable cause determination was anything other than objectively reasonable. "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Leon*, 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984). There is no record of bias on Judge Grossi's part, and no proof, or even a claim, that Maurizi was dishonest or reckless in preparing his affidavit. Investigator Maurizi submitted much more than a "bare bones" affidavit. The affidavit related the results of an extensive investigation involving New Jersey and New York law enforcement agents, associates of Cleary, criminal history inquiries, and the review of large quantities of telephone records and pen register information. There is no basis on this record for concluding that Maurizi's reliance on Judge Grossi's probable cause determination was anything other than objectively reasonable.

Accordingly, Defendants' motion to suppress the electronic surveillance evidence on probable cause grounds is denied.

Cleary raises three additional arguments in support of his motion to suppress the wiretap evidence. Cleary first claims that the April 25, 1991 wiretap order concerning his telephone was not supported by a prosecutor's authorization affidavit, as required under New Jersey law. *See* Cleary Br. at 1–

2. Attached as Exhibit C to the Gardephe affirmation is a copy of an authorization affidavit executed by John J. Fahy, the Bergen County Prosecutor. The affidavit—which is dated April 24, 1991—authorizes Investigator Maurizi to submit a wiretap application concerning Cleary's telephone. *See* Gardephe Aff., Exhibit C. Accordingly, Cleary's argument that the wiretap application was not properly supported by a prosecutor's authorization is utterly frivolous.

Cleary also argues that the tape recordings obtained pursuant to the first Cleary wiretap order and a ten-day extension order were not timely sealed. *See* Cleary Br. 3–4. This claim is equally frivolous.

The first Cleary wiretap order authorized interception for a period of twenty days, from April 25, 1991 at 10:00 a.m., until May 15, 1991 at 10:00 a.m. Gardephe Aff., Exh. B. Prior to the expiration of this first wiretap order—on May 15, 1991 at 9:15 a.m.—Investigator Maurizi obtained an order granting a ten-day extension of the original wiretap order. Gardephe Aff., Exh. D. On May 24, 1991, prior to the expiration of the ten-day extension period, Investigator Maurizi obtained a third wiretap order, authorizing interception for an additional twenty day period. Gardephe Aff., Exh. E. The tape recordings obtained during the first thirty days of interception were sealed on May 28, 1991. *See* Criminal Action Order for Sealing And Storage Of Tapes, attached as Exhibit F to Gardephe Aff., and Affidavit In Support Of Sealing Order, attached as Exhibit G. to Gardephe Aff. The sealing of the tapes at this time was entirely proper.

 Federal law determines whether or not the taped evidence here was sealed in a timely manner. In *United States v. Vazquez,* 605 F.2d 1269 (2d Cir.), 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979), a case directly on point, the Second Circuit considered a sealing challenge to tapes obtained by the Hudson County Prosecutor's Office pursuant to a wiretap order issued by a New Jersey Superior Court judge. The Court noted "at the outset that the measurement of a particular sealing delay and the determination of whether that delay requires suppression of a wiretap tape otherwise admissible in

a federal trial are matters of federal law." *United States v. Vazquez,* 605 F.2d at 1275. "Tapes sealed in compliance with the federal standards are admissible in federal court regardless of whether under applicable state law the tapes have been properly sealed." *Id.* at 1276. Most importantly, the Court held that "[u]nder federal law, sealing delays are to be measured from the *termination date of the continuous period of interception of a given telephone,* regardless of the number or length of judicial orders that have been issued to authorize that surveillance." *Id.* (emphasis added) (citing *United States v. Scafidi,* 564 F.2d 633, 641 (2d Cir.1977), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 400 (1978) and *United States v. Fury,* 554 F.2d at 533).

The Second Circuit further noted that Federal law "places no limit on the number of [thirty-day wiretap] orders or extension orders that may be issued to authorize continuation of a given interception." *United States v. Vazquez,* 605 F.2d at 1276; *see also* 18 U.S.C. § 2518(5). Moreover, sealing requirements are triggered only upon the expiration of the " 'period of the [wiretap] order, or extensions thereof.' " *Id.*

 The Court then turned to the precise issue raised by Cleary here: whether tapes obtained pursuant to New Jersey wiretap law must be sealed immediately after the expiration of the initial twenty-day authorization and ten-day extension, where continuous interception continued pursuant to orders issued after the expiration of the ten-day extension order. The Court noted that "[i]n contrast to the federal act [which provides for thirty day orders and extensions], the New Jersey statute permits issuance only of 20–day orders and 10–day extensions." The Court stated that "New Jersey's policy choice regarding the authorization of continuous wiretaps cannot logically be viewed as affecting the approach to be taken by the federal courts in assessing the adequacy of the sealing of the tapes obtained in the course of those taps." *Id.* at 1277. Accordingly, the Court held that the phrase " 'period of the order, or extensions thereof,' in the sealing provision of the federal statute, § 2518(8)(a) ... encompass[es] a continuous

authorized wiretap in its entirety, regardless of whether the judicial orders authorizing the initiation or continuation of the tap are denominated 'orders,' 'extensions,' 'renewals,' or 'continuations.' " *Id.*

*Vazquez* requires rejection of Cleary's argument here that the tapes from the first thirty days of interception were not timely sealed. Because Investigator Maurizi obtained a twenty day authorization order on May 24, 1991, prior to the expiration of the ten-day extension order on May 25, 1991, the period of continuous interception was not broken. The May 24, 1991 order involved the same telephone in the same premises as the earlier orders. The crimes and subjects listed in the May 24th order were substantially the same as those listed in the ten-day extension order. Accordingly, the New Jersey investigators were not required to seal the tapes from the first thirty days of interception until after the expiration of the new twenty day authorization order—a date long after May 28, 1991, the day on which the tapes were actually sealed.

■ Even if the obligation to seal the tapes from the first thirty days of interception arose when that interception terminated—an argument rejected in *Vazquez*—the delay in sealing the tapes was not unreasonable. The ten day extension order expired on May 25, 1991, the Saturday of Memorial Day weekend. The tapes were sealed on May 28, 1991, the first business day following the expiration of the wiretap order. Numerous courts in this Circuit have held that a two-day delay in sealing tapes—over a weekend—does not violate the "immediate" sealing requirement of Section 2518(8)(a). *United States v. Ardito,* 782 F.2d 358, 362–63 (2d Cir.1986) (five day delay excused where intervening two-day holiday); *United States v. Burford,* 755 F.Supp. 607 (S.D.N.Y.1991) (wiretap expired on Friday; tapes sealed on Monday; "[s]ince the government sealed the tapes on the first business day after the surveillance was terminated, there is no legitimate basis for excluding the tapes from evidence"); *United States v. Santoro,* 647 F.Supp. 153, 163 (E.D.N.Y.1986) (Friday expiration, Monday sealing upheld), *aff'd w/out op.,* 880 F.2d 1319 (2d Cir.1989). In sum, Cleary's claim that the electronic surveillance evidence should be suppressed because of sealing violations is utterly frivolous.

Finally, Cleary argues that New Jersey prosecutors erred in failing to seek an amendment of the April 25, 1991 wiretap order to permit disclosure of conversations relating to offenses other than those specified in the order of authorization. Cleary contends that "conversational references to the carrying of firearms are first set forth in the May 25th affidavit supporting a new wiretap order," and that because firearms offenses were not named in the original wiretap order, the New Jersey prosecutors should have proceeded by formal amendment. *See* Cleary Br. 5–7.

■ Cleary is incorrect. While he predicates his argument on the assumption that the firearms related conversations were first revealed in an affidavit for a "new wiretap order," these conversations were first set forth in an extension affidavit. Investigator Maurizi informed the supervising judge of firearms related conversations in his affidavit seeking a ten-day extension of the April 25, 1991 wiretap order. *See* Gardephe Aff., Exh. H, at 19–20. The Second Circuit has repeatedly stated that "authorization under 18 U.S.C. § 2517(5) may be inferred when a judicial officer grants a continuation of the surveillance, even though the offense was not listed in the original order, so long as he was made aware of 'material facts constituting or clearly relating to [the] other offenses' in the application for the continuance." *United States v. Ardito,* 782 F.2d at 358 quoting *United States v. Masciarelli,* 558 F.2d 1064, 1067–68 (2d Cir.1977). Here the supervising judge was fully informed of the firearms related conversations in the extension affidavit. In any event, conversations regarding firearms clearly constituted evidence relevant to the offenses listed in the original wiretap order, which included narcotics trafficking and crimes of violence such as robbery. Accordingly, Cleary's argument that the New Jersey prosecutors somehow violated Section 2517(5) is entirely specious.

In sum, defendants' motions to suppress the electronic surveillance evidence are, in all respects, denied without a hearing.

## IX. *Other Defense Motions*

All other defense motions and applications are, for insufficient support, denied.

SO ORDERED.